Charles H. Chevalier
Michael V. Caracappa
Christian Villatoro
**FBT Gibbons LLP**
One Gateway Center
Newark, New Jersey 07102-5310
cchevalier@fbtgibbons.com
mcaracappa@fbtgibbons.com
cvillatoro@fbtgibbons.com

*Attorneys for Plaintiff Xeris Pharmaceuticals, Inc.*

OF COUNSEL:

David P. Frazier
Kelly A. Welsh
Rozzi Upton
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200

Marc N. Zubick
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
(312) 876-7606

Sophia Lam
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, New York 10020
(212) 906-1200

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

XERIS PHARMACEUTICALS, INC.,

Plaintiff,

v.

TORRENT PHARMA INC., TORRENT PHARMACEUTICALS LIMITED, CYCLE PHARMACEUTICALS LIMITED, LEMED PHARMACY III, LLC, AND LEMED SPECIALTY PHARMACY ARIZONA, LLC

Defendants.

Civil Action No. 2:26-13654

**COMPLAINT**

JURY TRIAL DEMANDED

Plaintiff Xeris Pharmaceuticals, Inc. ("Xeris" or "Plaintiff"), by its undersigned attorneys, brings this action against Defendants Torrent Pharma Inc. ("Torrent Pharma"), Torrent Pharmaceuticals Limited ("Torrent Limited") (collectively, "Torrent"), Cycle Pharmaceuticals

Limited ("Cycle"), LeMed Pharmacy III, LLC ("LeMed III"), and LeMed Specialty Pharmacy Arizona, LLC ("LeMed AZ") (collectively, "LeMed") (each individually a "Defendant" and collectively, "Defendants") and hereby alleges as follows:

## NATURE OF THE ACTION

1. This is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1, *et seq.*, and in particular under 35 U.S.C. § 271(b), to enjoin and obtain damages resulting from Defendants' unauthorized importation into the United States and use, sale, offer for sale, marketing, distribution, and promotion of products that infringe claim 1 of Xeris's United States Patent No. 12,758,502 (the "'502 Patent" or the "Asserted Patent").

2. Torrent Pharma submitted Abbreviated New Drug Application ("ANDA") No. 215924 (the "Torrent ANDA") to the United States Food and Drug Administration ("FDA"), seeking approval to manufacture and sell products that rely on data from bioavailability and/or bioequivalence studies contained in the approved labeling for Xeris's KEVEYIS®, dichlorphenamide 50 mg tablets for oral use product, prior to the expiration of the Asserted Patent.

3. The FDA approved ANDA No. 215924 on December 29, 2022. Following that approval, Torrent began to import into the United States, and/or use, sell, and/or offer to sell in the United States, its ANDA Product, dichlorphenamide 50 mg tablets for oral use (the "Torrent ANDA Product").

4. As of at least May 10, 2024, Torrent and Cycle entered into an agreement with each other to market, distribute, offer for sale, and sell dichlorphenamide 50 mg tablets for oral use under the trade name Ormalvi®, under the same ANDA No. 215924.

5. On or around May 14, 2024, Cycle entered into an agreement with LeMed to serve as the exclusive specialty pharmacy partner for the distribution of Ormalvi®. *See* John Santilli,

*Cycle Pharmaceuticals Selects LeMed Specialty Pharmacy and Anovo as Exclusive Specialty Pharmacies*, BIOPHARMA (May 14, 2024), https://accessmarketintell.com/2024/05/14/cycle-pharmaceuticals-selects-lemed-specialty-pharmacy-and-anovo-as-exclusive-specialty-pharmacies [hereinafter the "LeMed Exclusivity Announcement"]. On information and belief, since partnering with Cycle, LeMed has managed and dispensed Ormalvi® to patients nationwide.

**KEVEYIS®**

6. KEVEYIS® (dichlorphenamide) is the first FDA-approved medicine for the treatment of primary periodic paralysis ("PPP"), a rare and debilitating hereditary neuromuscular disease characterized by recurrent attacks of muscle weakness or temporary paralysis. PPP presents clinically as two principal subtypes: primary hyperkalemic periodic paralysis and primary hypokalemic periodic paralysis. KEVEYIS® is an oral carbonic anhydrase inhibitor indicated for the treatment of both subtypes and related variants.

7. PPP imposes a substantial burden on patients, who may experience sudden and unpredictable attacks lasting minutes, hours, or days, with resulting morbidity and impaired quality of life. Because PPP is rare and clinically complex, patients may experience significant delays before receiving an accurate diagnosis. KEVEYIS® represented an important therapeutic advance for this underserved patient population.

8. On August 7, 2015, FDA approved New Drug Application ("NDA") No. 011366 for KEVEYIS® and granted KEVEYIS® orphan drug exclusivity, recognizing the critical unmet medical need for effective therapies for patients with PPP. Xeris is the holder of NDA No. 011366 for KEVEYIS®. Xeris markets KEVEYIS® (dichlorphenamide) in the United States pursuant to the KEVEYIS® NDA and Xeris continues to invest in its clinical development.

## PARTIES

9. Plaintiff Xeris is a corporation organized and existing under the laws of the State of Delaware, with its corporate offices and principal place of business at 1375 W. Fulton St., Suite 1300, Chicago, Illinois 60607. Xeris discovers, develops, manufactures, and markets innovative pharmaceutical products to improve patient lives.

10. Xeris owns all rights, title, and interest in and to the Asserted Patent.

11. On information and belief, Defendant Torrent Pharma is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 106 Allen Road, Suite 305, Basking Ridge, New Jersey 07920. On information and belief, Torrent Pharma is a wholly owned subsidiary of Torrent Limited. On further information and belief, Torrent Pharma holds any intellectual property rights and marketing authorizations for the Torrent ANDA Product and Ormalvi® (collectively, the "Accused Products").

12. On information and belief, Defendant Torrent Limited is a private limited company organized and existing under the laws of India, having its corporate headquarters at Avirat, Thaltej Shilaj Road, Ahmedabad, 380059, Gujarat, India. On information and belief, Torrent Limited plays a crucial role in the production and supply of the Accused Products.

13. On information and belief, Torrent Pharma and Torrent Limited collaborate with respect to the development, regulatory approval, marketing, sale, and/or distribution of generic drug products for sale in the United States, including in New Jersey. On further information and belief, Torrent Pharma and Torrent Limited are agents of one another and/or operate in concert as integrated parts of the same business group and enter into agreements with each other that are nearer than arm's length.

14. On information and belief, Defendant Cycle is a private limited company organized and existing under the laws of the United Kingdom, having its principal place of business at The Broers Building, 21 JJ Thomson Ave, Cambridge, CB3 0FA, United Kingdom. On information and belief, Cycle plays a crucial role in the commercialization, marketing, distribution, and patient-support infrastructure for Ormalvi® in the United States.

15. Torrent and Cycle entered into an agreement and/or otherwise act in concert with respect to the U.S. commercialization of Ormalvi®. Cycle publicly announced that Ormalvi® was being launched in partnership between Cycle and Torrent, and Cycle's public materials identify Ormalvi® as a trademark of Torrent Pharma. *See, e.g.*, Cycle Pharma, *New US Product, ORMALVI™ (Dichlorphenamide) Tablets Launches* (May 10, 2024), https://cyclepharma.com/news/ormalvi-launch.

16. On information and belief, Defendant LeMed III is a limited liability company organized and existing under the laws of the State of New York, having its principal place of business at 2417 3rd Ave, Ste 406, Bronx, New York 10451. On information and belief, LeMed III dispenses, distributes, offers for sale, and sells pharmaceutical products including Ormalvi® throughout the United States, including in New Jersey. *See* LeMed, *Locations*, https://www.lemedrx.com/locations ("We now have bi-coastal coverage and ship to all 50 states and Puerto Rico.").

17. On information and belief, Defendant LeMed AZ is a limited liability company organized and existing under the laws of the State of New York and registered to do business in New Jersey as a foreign limited liability company. On information and belief, LeMed AZ dispenses, distributes, offers for sale, and sells pharmaceutical products including Ormalvi® throughout the United States, including in New Jersey. *See* LeMed, *Locations*,

https://www.lemedrx.com/locations ("We now have bi-coastal coverage and ship to all 50 states and Puerto Rico.").

18. The approved labeling for the Torrent ANDA Product recites that it is "Manufactured by: Zenara Pharma Pvt. Ltd. Hyderabad-500051, India" and "Manufactured for: Torrent Pharma Inc. Basking Ridge, NJ 07920." *See* FDA, Highlights of Prescribing Information at § 17, https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=64bf0c71-2113-47dc-8ce5-7fe535e558dc [hereinafter the "Torrent ANDA Product Approved Labeling"]. On information and belief, Torrent imports the Torrent ANDA Product into the United States, and thereafter directly or indirectly markets, sells, and distributes the Torrent ANDA Product throughout the United States, including in New Jersey.

19. On information and belief, and consistent with their practice with respect to other drug products, following FDA approval of ANDA No. 215924, Torrent Pharma, Torrent Limited, and Cycle have acted and continue to act in concert to import, market, distribute, dispense, offer for sale, and sell the Torrent ANDA Product and Ormalvi® throughout the United States and within New Jersey. Torrent distributes the Torrent ANDA Product through traditional wholesale channels, while Cycle distributes Ormalvi® exclusively through LeMed specialty pharmacies.

20. The approved labeling for Ormalvi® recites that it is "Manufactured by: Zenara Pharma Pvt. Ltd. Hyderabad-500051, India" and "Manufactured for: Cycle Pharmaceuticals Ltd. Cambridge, CB3 0FA, UK." *See* FDA, Highlights of Prescribing Information at § 17, https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=3989e220-6502-449b-be39-e2689acce08c [hereinafter the "Ormalvi® Approved Labeling"]. On information and belief, Torrent and Cycle import Ormalvi® into the United States, and thereafter directly or indirectly market, sell, and distribute Ormalvi® throughout the United States, including in New Jersey.

21. On information and belief, Defendants are in the business of, among other things, developing, manufacturing, obtaining regulatory approval for, marketing, importing, distributing, offering for sale, and selling pharmaceutical products, including the Accused Products, throughout the United States, including in New Jersey.

22. On information and belief, Torrent Pharma and Torrent Limited act in concert with, and rely on material assistance from, one another and their affiliates, agents, distributors, patient-support programs, and specialty pharmacies to market, distribute, offer for sale, sell, and dispense the Torrent ANDA Product in the United States, including in New Jersey.

23. On information and belief, Torrent, Cycle, and LeMed act in concert with, and rely on material assistance from, one another and their affiliates, agents, distributors, patient-support programs, and specialty pharmacies to market, distribute, offer for sale, sell, and dispense Ormalvi® in the United States, including in New Jersey.

24. Defendants know and intend that the Accused Products have been, are being, and will continue to be, prescribed, dispensed, distributed, sold, and used throughout the United States, including in New Jersey, through established commercial channels and in accordance with the Accused Products' FDA-approved labeling and Defendants' product-specific promotional and patient-support materials.

**<u>JURISDICTION AND VENUE</u>**

25. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

26. This Court has personal jurisdiction over Torrent Pharma because Torrent Pharma has its principal place of business in New Jersey and has registered to do business with the State of New Jersey's Division of Revenue and Enterprise Services as a business operating in New

Jersey under Business ID No. 0400474439. Torrent Pharma has thus consented to personal jurisdiction in New Jersey.

27. This Court has personal jurisdiction over Torrent Limited because, *inter alia*, Torrent Limited has continuous and systematic contacts with the State of New Jersey, regularly conducts business in the State of New Jersey, either directly or through one or more of its wholly owned subsidiaries, agents, and/or alter egos, has purposefully availed itself of the privilege of doing business in the State of New Jersey, and sells the Accused Products in the State of New Jersey pursuant to the Torrent ANDA.

28. This Court has personal jurisdiction over Cycle because, *inter alia*, Cycle has continuous and systematic contacts with the State of New Jersey, regularly conducts business in the State of New Jersey, either directly or through one or more of its wholly owned subsidiaries, agents, and/or alter egos, has purposefully availed itself of the privilege of doing business in the State of New Jersey, and sells Ormalvi® in the State of New Jersey pursuant to the Torrent ANDA.

29. This Court has personal jurisdiction over LeMed III because, *inter alia*, LeMed III has continuous and systematic contacts with the State of New Jersey, regularly conducts business in the State of New Jersey including by distributing, dispensing, and selling pharmaceutical products including Ormalvi®, either directly or through one or more of its wholly owned subsidiaries, agents, and/or alter egos, and has purposefully availed itself of the privilege of doing business in the State of New Jersey. *See, e.g., LeMed Selected as Exclusive U.S. Distributor and Services Partner for Harliku*, LEMED (July 21, 2025), https://www.lemedrx.com/news-release/lemed-selected-as-exclusive-us-distributor-and-services-partner-for-harliku ("LeMed holds dual-specialty accreditations, offers both commercial and non-commercial dispensing, and is licensed to ship to all 50 states and Puerto Rico.").

30. This Court has personal jurisdiction over LeMed AZ because LeMed AZ has registered to do business with the State of New Jersey's Division of Revenue and Enterprise Services as a business operating in New Jersey under Business ID No. 0451110497. LeMed AZ has thus consented to personal jurisdiction in New Jersey. LeMed AZ also has continuous and systematic contacts with the State of New Jersey, regularly conducts business in the State of New Jersey, has purposefully availed itself of the privilege of doing business in the State of New Jersey, and dispenses, distributes, offers for sale, and sells Ormalvi® in the State of New Jersey.

31. LeMed derives substantial revenue from selling pharmaceutical products throughout the United States, including in this District, and from the sale of Ormalvi®, and has availed itself of the privilege of conducting business in New Jersey.

32. In the alternative, this Court has personal jurisdiction over Torrent Limited and Cycle in the State of New Jersey under Federal Rule of Civil Procedure 4(k)(2) because Torrent Limited and Cycle are not subject to jurisdiction in any state's courts of general jurisdiction and exercising jurisdiction over them is consistent with the United States Constitution and laws.

33. On information and belief, Defendants are licensed to sell generic and proprietary pharmaceutical products in the State of New Jersey, either directly or through one or more of their wholly owned subsidiaries, agents, and/or alter egos.

34. Defendants are in the business of manufacturing, marketing, importing, distributing, and selling pharmaceutical drug products, including generic drug products, either directly or through subsidiaries, agents, and/or alter egos, which the Defendants manufacture, distribute, market, and/or sell throughout the United States and in this judicial district.

35. Defendants have committed and continue to commit, aid, abet, induce, and/or participate in the commission of acts of patent infringement that have harmed and injured Xeris,

which manufactures and markets KEVEYIS® for sale and use throughout the United States, including in this judicial district.

36. Defendants know and intend that the Accused Products have been, are being, and will continue to be, prescribed, dispensed, used, distributed, and sold in this District and throughout the United States through established commercial channels, including specialty pharmacies and patient-support programs.

37. Defendants derive substantial revenue from the marketing, distribution, offer for sale, sale, and/or importation of pharmaceutical drug products, including dichlorphenamide products, in the United States.

38. On information and belief, Torrent has sold the Torrent ANDA Product in the State of New Jersey, lists the Torrent ANDA Product on the State of New Jersey's prescription drug formulary, and seeks Medicaid reimbursements for sales of the Torrent ANDA Product in the State of New Jersey, either directly or through one or more of its wholly owned subsidiaries, agents, and/or alter egos.

39. On information and belief, Torrent derives substantial revenue from the marketing, manufacture, and/or sale of generic pharmaceutical products, including the Torrent ANDA Product, in the United States and in the State of New Jersey.

40. On information and belief, Torrent knows and intentionally distributes and sells the Torrent ANDA Product in the State of New Jersey, thereby displacing sales of KEVEYIS® and causing injury to Plaintiff. Torrent takes advantage of its established channels of distribution in the State of New Jersey for the sale of the Torrent ANDA Product.

41. Torrent Pharma and Torrent Limited regularly invoke the jurisdiction of the courts of this judicial district by pleading claims and counterclaims in pharmaceutical patent infringement

actions in this District. *See, e.g.*, Answer, Separate Defenses, and Countercls. of Torrent Pharms. Ltd. and Torrent Pharma Inc. at 14-25, *Takeda Pharm. Co. Ltd. v. Torrent Pharms. Ltd.*, No. 2:17-cv-03186-SRC-CLW, ECF No. 12 (D.N.J. July 7, 2017); Defs.' Torrent Pharms. Ltd. and Torrent Pharma Inc.'s Answer, Defenses, and Countercls. at 55-67, *Supernus Pharms. Inc. v. Torrent Pharms. Ltd.*, No. 3:21-cv-14268-FLW-LHG, ECF No. 11 (D.N.J. Sept. 29, 2021); Def. Torrent Pharms. Ltd.'s Answer to Compl. and Countercls. and Demand for Jury Trial at 32-41, *Amgen Inc. v. Torrent Pharms. Ltd.*, No. 3:18-cv-11156-MAS-DEA, ECF No. 16 (D.N.J. Aug. 29, 2018). Torrent Pharma and Torrent Limited have also not contested personal jurisdiction or venue in pharmaceutical patent litigation in this judicial district. *See, e.g.*, Torrent Answer at 3-4, *Takeda Pharm.*, No. 2:17-cv-03186-SRC-CLW, ECF No. 12; Torrent Answer at 5-16, *Supernus Pharms.*, No. 3:21-cv-14268-FLW-LHG, ECF No. 11; Torrent Answer at 3-7, *Amgen*, No. 3:18-cv-11156-MAS-DEA, ECF No. 16.

42. For at least the above reasons, exercising jurisdiction over Defendants would not be unfair or unreasonable because Defendants have purposefully availed themselves of the privilege of conducting business in the United States, including by launching, marketing, distributing, offering for sale, and selling the Accused Products in the United States.

43. Venue is proper in this District under 28 U.S.C. §§ 1391(c), 1391(d), and 1400(b).

44. Venue is proper against Torrent Pharma because, *inter alia*, it maintains a regular and established place of business in this District and has committed an act of infringement in this District.

45. Venue is proper against Torrent Limited and Cycle, foreign corporations, in any judicial district that has personal jurisdiction, including this District.

46. Venue is proper against LeMed because it has induced acts of patent infringement in this District by marketing, distributing, dispensing, and shipping into this District, or by using, distributing, offering to sell, or selling, or by causing others to use, offer to sell, or sell in this District.

## THE ASSERTED PATENT

47. On October 13, 2026, the United States Patent and Trademark Office ("USPTO") duly and legally issued the '502 Patent entitled "Compositions and Methods of Use." A true and correct copy of the '502 Patent is attached as **Exhibit 1**. The '502 Patent is listed in *Approved Drug Products with Therapeutic Equivalence Evaluations* (an FDA publication commonly known as the "Orange Book") for KEVEYIS® (dichlorphenamide).

48. Xeris owns all rights, title, and interest in and to the '502 Patent.

49. Claim 1 of the '502 Patent recites:

> A method of administering dichlorphenamide to treat primary hyperkalemic periodic paralysis or primary hypokalemic periodic paralysis in a human subject in need thereof, wherein the subject is also being administered famotidine for the treatment of a disease or disorder, the method comprising: discontinuing administration of the famotidine to the subject, and administering dichlorphenamide in tablet form to the subject at an initial dose of 50 mg, once or twice daily, thereby avoiding concomitant administration of famotidine and dichlorphenamide to the subject.

50. KEVEYIS® is a product that falls within the ambit of claim 1 of the '502 Patent. KEVEYIS® is sold and distributed in the United States with prescribing information that instructs healthcare providers, pharmacists, and/or patients according to the method of claim 1. In particular, the KEVEYIS® prescribing information states that KEVEYIS® "is indicated for the treatment of primary hyperkalemic periodic paralysis, primary hypokalemic periodic paralysis, and related variants," and directs healthcare providers to "[i]nitiate dosing at 50 mg by mouth once or twice daily" in 50 mg tablet form. *See* FDA, Highlights of Prescribing Information at §§ 1, 2,

https://dailymed.nlm.nih.gov/dailymed/lookup.cfm?setid=d30a87b9-90fb-35b2-e053-2995a90aea2c [hereinafter the "KEVEYIS® Prescribing Information"].

51. The KEVEYIS® prescribing information further instructs healthcare providers, pharmacists, and patients that "dichlorphenamide is an inhibitor of OAT1 transporters," that "[t]he concomitant administration of KEVEYIS may increase the plasma exposures of OAT1 substrates," and that "[u]se of KEVEYIS with drugs that are sensitive to OAT1 inhibition (e.g., methotrexate, famotidine, oseltamivir) is not recommended." *See* KEVEYIS® Prescribing Information at § 7.2. The KEVEYIS® prescribing information also directs healthcare providers to "[i]nstruct patients to notify their healthcare provider of all of the drugs and over-the-counter medications that they take." *Id.* at § 17.

52. The above language provides a clear, affirmative instruction to healthcare providers and/or pharmacists about the danger of administering KEVEYIS® to patients taking famotidine and unequivocally instructs and encourages them to discontinue famotidine prior to administering KEVEYIS® and to instruct their patients accordingly in order to avoid that danger.

53. There is an actual case or controversy between the parties regarding Defendants' liability for their infringement of the '502 Patent.

## <u>THE ACCUSED PRODUCTS</u>

***Common Factual Foundation: Label Language and FDA Equivalence***

54. The Torrent ANDA Product and Ormalvi® are both marketed and sold pursuant to Torrent's ANDA No. 215924.

55. Under the Torrent ANDA, the Approved Labeling for both the Torrent ANDA Product and Ormalvi® (collectively, the "Accused Products' Approved Labeling") states that dichlorphenamide tablets are "indicated for the treatment of primary hyperkalemic periodic

paralysis, primary hypokalemic periodic paralysis, and related variants," and directs healthcare providers and/or pharmacists to "[i]nitiate dosing at 50 mg by mouth once or twice daily." *See* Torrent ANDA Product Approved Labeling at §§ 1, 2; *see also* Ormalvi® Approved Labeling at §§ 1, 2.

56. The Accused Products' Approved Labeling expressly warns patients, healthcare providers, and/or pharmacists against the harmful effects of coadministration of dichlorphenamide and famotidine and instructs and encourages them to discontinue famotidine prior to administering dichlorphenamide. More specifically, the Accused Products' Approved Labeling states that "dichlorphenamide is an inhibitor of OAT1 transporters" and that "[u]se of dichlorphenamide with drugs that are sensitive to OAT1 inhibition (e.g., methotrexate, famotidine, oseltamivir) is not recommended." *See* Torrent ANDA Product Approved Labeling at § 7.2; *see also* Ormalvi® Approved Labeling at § 7.2. The Section 7.2 language in the Torrent ANDA Product Approved Labeling and the Ormalvi® Approved Labeling is identical in all material respects.

57. The Accused Products' Approved Labeling further instructs patients to "notify their healthcare provider of all of the drugs and over-the-counter medications that they take." *See* Torrent ANDA Product Approved Labeling at § 17; *see also* Ormalvi® Approved Labeling at § 17. This instruction is particularly significant for famotidine, which is widely available over the counter, without a prescription, both as a generic drug and as the brand-name drugs Pepcid AC and Zantac 360. *See* Healthline, *Famotidine and Cost: What You Need to Know*, https://www.healthline.com/health/drugs/famotidine-cost. Because patients may purchase and take famotidine without a prescription, their famotidine use may not appear in their prescription records, and healthcare providers and/or pharmacists may learn of it only if patients disclose it. This instruction is intended to and in fact encourages patients to tell their healthcare providers

and/or pharmacists about all medications they take, including famotidine, so that healthcare providers and/or pharmacists can cease, and instruct patients to cease, administering drugs, like famotidine, prior to administering dichlorphenamide.

58. The "not recommended" labeling language in the Drug Interactions section of the Accused Products' Approved Labeling is a clear, affirmative warning and instruction to healthcare providers and/or pharmacists to discontinue famotidine prior to administering dichlorphenamide, and to instruct their patients accordingly; that is, to practice the method of claim 1 of the Asserted Patent themselves and/or to direct and encourage their patients to do so.

59. The Accused Products' Approved Labeling thus encourages, recommends, instructs, and/or promotes avoiding concomitant administration of famotidine and dichlorphenamide to patients with primary hyperkalemic periodic paralysis or primary hypokalemic periodic paralysis, in accordance with the method recited in claim 1 of the Asserted Patent. The Accused Products' Approved Labeling is identical in this respect to the labeling for Xeris's branded KEVEYIS® product, and each Defendant knew or should have known that the Section 7.2 language would be understood by healthcare providers, pharmacists, and/or patients as an instruction to avoid concomitant use of famotidine and dichlorphenamide by ceasing administration of famotidine before administering dichlorphenamide.

***The Torrent ANDA Product***

60. Torrent received final FDA approval for the Torrent ANDA Product under ANDA No. 215924 on December 29, 2022. *See* FDA, Torrent ANDA Approval, https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2023/215924Orig1s000ltr.pdf. Following that approval, Torrent began to import into the United States, and/or use, sell, and/or offer to sell in the United States, the Torrent ANDA Product.

61. The Torrent ANDA Product is supplied in bottles of 30 tablets under NDC 13668-676-30 and bottles of 100 tablets under NDC 13668-676-01.

62. The Torrent ANDA Product, Dichlorphenamide Tablets, USP, is prominently listed as a product for sale by Torrent on Torrent's website. Torrent, Our Products, Dichlorphenamide Tablets, USP, https://www.torrentpharma.com/pi/usa/products/1338.

63. Torrent publicly announced on April 6, 2023, that it had begun shipping the generic version of Xeris's KEVEYIS® (dichlorphenamide) 50 mg tablets in the United States following final FDA approval of the Torrent ANDA, and public NDC listing information identifies a December 29, 2022, marketing start date for the Torrent ANDA Product. *Torrent Pharma launches First and Only Generic Version of Keveyis® (dichlorphenamide) Tablets in the United States*, PR NEWSWIRE (Apr. 6, 2023, 11:50 ET), https://www.prnewswire.com/news-releases/torrent-pharma-launches-first-and-only-generic-version-of-keveyis--dichlorphenamide-tablets-in-the-united-states-301791919.html; *see also* FDA, National Drug Code Directory https://www.accessdata.fda.gov/scripts/cder/ndc.

64. On information and belief, since at least April 2023, Torrent has marketed, distributed, offered for sale, and sold the Torrent ANDA Product throughout the United States, including in New Jersey, through traditional wholesale distribution channels. On further information and belief, the Torrent ANDA Product is distributed through wholesaler intermediaries to retail and specialty chain pharmacies, including CVS and Optum, and is not distributed through the exclusive specialty pharmacy arrangement described below for Ormalvi®. On information and belief, pharmacists at these retail and specialty chain pharmacies are required by federal and state law to conduct prospective drug utilization review ("DUR") upon dispensing new prescriptions, including screening for drug-drug interactions ("DDIs"). *See* 42 U.S.C. § 1396r-

8(g)(2)(A); N.J.A.C. § 13:39-7.21. On further information and belief, by distributing the Torrent ANDA Product with the Section 7.2 language on the Torrent ANDA Product Approved Labeling, Torrent causes this DDI information to be loaded into automated pharmacy DUR systems, which generate alerts that trigger legally mandated pharmacist action when the Torrent ANDA Product is dispensed to a patient also taking famotidine.

65. Torrent maintains an active pharmacovigilance program with respect to the Torrent ANDA Product. The Torrent ANDA Product Approved Labeling instructs patients and healthcare providers to "report SUSPECTED ADVERSE REACTIONS" by contacting "Torrent Pharma, Inc. at 1-800-912-9561." *See* Torrent ANDA Product Approved Labeling at § 17. On information and belief, Torrent actively receives, processes, and reports adverse drug experiences from patients using the Torrent ANDA Product to the FDA through the FDA Adverse Event Reporting System ("FAERS"). The FAERS database reflects that Torrent is the reporting entity for numerous adverse event reports involving dichlorphenamide from 2023 through the present, including reports coding "Product Substitution Issue," "Drug Ineffective," and "Treatment Failure" as reported reactions. This ongoing patient and healthcare provider engagement confirms that Torrent is not merely a passive distributor of the Torrent ANDA Product but maintains active, ongoing contact with patients and healthcare providers regarding the use of its product, including regarding drug-drug interactions and adverse reactions associated with dichlorphenamide therapy.

66. On information and belief, since approval of the Torrent ANDA, Torrent has been importing the Torrent ANDA Product into the United States, using the Torrent ANDA Product in the United States, offering the Torrent ANDA Product for sale in the United States, and selling the Torrent ANDA Product in the United States, including New Jersey.

67. On information and belief, Torrent markets and sells the Torrent ANDA Product in the United States at a substantial discount to the KEVEYIS® wholesale acquisition cost. Torrent's sale of the Torrent ANDA Product at a substantial discount to KEVEYIS® has caused Xeris irreparable harm, including price erosion, lost sales, and loss of market share.

***Ormalvi® Branded Generic***

68. As of at least May 10, 2024, Torrent and Cycle entered into an agreement with each other to market, distribute, offer for sale, and sell dichlorphenamide 50 mg tablets for oral use under the trade name Ormalvi®, under the same ANDA No. 215924 approval. Cycle publicly announced that Ormalvi® was being launched in partnership between Cycle and Torrent, and Cycle's public materials identify Ormalvi® as a trademark of Torrent Pharma. *See, e.g.*, Cycle Pharma, *New US Product, ORMALVI™ (Dichlorphenamide) Tablets Launches* (May 10, 2024), https://cyclepharma.com/news/ormalvi-launch.

69. The Ormalvi® Approved Labeling recites that it is "Manufactured by: Zenara Pharma Pvt. Ltd. Hyderabad-500051, India" and "Manufactured for: Cycle Pharmaceuticals Ltd. Cambridge, CB3 0FA, UK." *See* Ormalvi® Approved Labeling at § 17. On information and belief, Torrent and Cycle import Ormalvi® into the United States, and thereafter directly or indirectly market, sell, and distribute Ormalvi® throughout the United States, including in New Jersey.

70. Ormalvi® competes directly with KEVEYIS®, including through the specialty pharmacy infrastructure and patient-support services described below, which demonstrates that the Cycle Vita™ program and the LeMed arrangement are central to Defendants' commercial strategy for Ormalvi®.

71. Cycle entered into an agreement with LeMed to serve as the exclusive specialty pharmacy partner for the distribution of Ormalvi® on or around May 14, 2024. *See* LeMed

Exclusivity Announcement. On information and belief, since partnering with Cycle, LeMed has managed and dispensed Ormalvi® to patients nationwide.

72. LeMed is one of the few specialty pharmacies dedicated to orphan therapies. LeMed holds dual-specialty accreditations from URAC (formerly the Utilization Review Accreditation Commission) and the Accreditation Commission for Health Care ("ACHC"), offers both commercial and non-commercial dispensing, and is licensed to ship to all 50 states and Puerto Rico. *See* LeMed, *Locations*, https://www.lemedrx.com/locations. LeMed maintains a dedicated webpage for Primary Periodic Paralysis as one of its rare disease therapeutic areas. *See* LeMed Specialty Pharmacy, *Primary Periodic Paralysis*, https://www.lemedrx.com/specialties/ord/primary-periodic-paralysis. According to LeMed's website, LeMed "provides patient education on an ongoing basis: during the intake process, upon start of new therapy and through regular personal monthly reassessment calls," and patients "can reach an on-call Pharmacist 24 hours a day, 7 days a week." *See* LeMed Specialty Pharmacy, *Support for Patients*, https://www.lemedrx.com/pharmacy-patients. On information and belief, LeMed's pharmacists are required by federal and state law to conduct prospective DUR upon dispensing new prescriptions, including screening for DDIs. *See* 42 U.S.C. § 1396r-8(g)(2)(A); N.J.A.C. § 13:39-7.21.

73. Cycle operates Cycle Vita™, a dedicated hub support program that delivers individualized product support to patients prescribed Ormalvi®. According to Defendants' own public materials, Cycle Vita™ is "our dedicated hub support program, which delivers individualized product support at every step" and provides "continuous support tailored to your needs." *See* Cycle Pharmaceuticals Ltd., Patient Support, https://cyclevita.life/select-a-treatment/ormalvi-dichlorphenamide-tablets. Cycle Vita™ employs dedicated Access Specialists

and Clinical Education Managers who provide patients with "clinical education, clinical support and medication administration support." *See* Cycle Pharmaceuticals Ltd., Patient Support, https://www.ormalvi.com/hcp/patient-support.

74. According to the Cycle Vita™ website, the program provides the following services to patients prescribed Ormalvi®:

- "Pharmacy Routing" — "We will route your ORMALVI therapy to the appropriate specialty pharmacy and follow-up to ensure swift shipment of your medication";
- "Continuous Clinical Product Support" — "We will provide you with product support to help manage every aspect of the ORMALVI therapeutic routine, such as clinical education and onboarding onto dichlorphenamide. Translation services are available on request";
- "Patient Nutrition Program" — "We will provide you with on-going personal guidance and education through the duration of therapy. Monthly calls can be up to 30-minutes and are tailored to your type of Primary Periodic Paralysis and any known triggers, to reinforce your clinic's nutrition plan";
- "Prescription Renewal Support" — providing ongoing engagement with patients beyond the initial dispense;
- "Prior Authorization" — coordinating "seamlessly between different parties, such as insurance companies, doctors, and pharmacists to help you with your prior authorization and document requirements";
- "Bridge Program" — "A free supply of ORMALVI that allows you to begin therapy immediately while Cycle Vita™ secures appropriate Benefit Verification and Prior Authorization"; and

- "Appeal Support" — where an appeal is needed, "our experienced team will work with your insurer to understand the requirements and provide your doctor with information to help with the appeal."

*See* Cycle Pharmaceuticals Ltd., Patient Support, https://cyclevita.life/select-a-treatment/ormalvi-dichlorphenamide-tablets.

75. Defendants have also developed, authored, published, and distributed a Patient Initiation Brochure ("PIB") to patients prescribed Ormalvi®. *See* Cycle Pharmaceuticals Ltd., ORMALVI (Dichlorphenamide) Tablets — Patient Initiation Brochure, US-DCP-2300016 (Jan. 2024), https://ormalvi.com/wp-content/uploads/2024/05/2300016-DCP-PIB-Digital.pdf. The PIB states that it is intended for patients "new to dichlorphenamide or . . . switching from another dichlorphenamide treatment." This language confirms that Cycle anticipates and encourages medication transitions—including transitions that require instructing patients about drug-drug interaction screening and the discontinuation of concomitant medications such as famotidine—in accordance with the method claimed in the Asserted Patent.

76. The PIB's prescribing information pages specifically state: "Tell your doctor if you are taking drugs that are sensitive to OAT1 inhibition such as methotrexate, famotidine or oseltamivir." *Id.* at 11. This language names the exact OAT1 substrates at issue in claim 1 of the Asserted Patent, and it does not appear merely in the FDA-mandated label; instead, it appears in a promotional brochure voluntarily created and proactively distributed by Cycle. No federal or state regulation required Cycle to create this brochure or to include this language in it.

77. The PIB's Important Safety Information separately instructs patients: "Tell your healthcare provider about all other prescription and over-the-counter medicines you take, including supplements, as some medicines can interact with ORMALVI." *Id.* at 1-2. This instruction—

repeated on the Cycle Vita™ website and the Ormalvi® enrollment page (https://cyclevita.life/enroll)—encourages and instructs the discontinuation of famotidine prior to initiation of dichlorphenamide therapy by encouraging patients to disclose their use of famotidine and other OAT1-sensitive medications to their healthcare providers and/or pharmacists.

78. The PIB further instructs patients: "You should expect to receive calls from the Cycle Vita™ team to support you in your ORMALVI treatment. Don't forget to save the number to your phone so you know to answer when they call: +1 (888) 360-8482." *Id.* at 8. This instruction confirms that Cycle Vita™ initiates active, outbound contact with patients (not merely passive availability) providing an ongoing channel for clinical education, instruction, and recommendations regarding the ORMALVI therapeutic routine, including drug-drug interactions.

79. Through the Cycle Vita™ platform, Defendants route all Ormalvi® prescriptions through a single exclusive specialty pharmacy, LeMed, to ensure that patients receive Ormalvi® together with the clinical education and support services available through Cycle Vita™. *See* Cycle Pharmaceuticals Ltd., Where to Send Rx, https://www.ormalvi.com/hcp/faqs/where-to-send-rx. The Cycle Vita™ website confirms that "Pharmacy Routing" is a core service: "We will route your ORMALVI therapy to the appropriate specialty pharmacy and follow-up to ensure swift shipment of your medication." *See* https://cyclevita.life/select-a-treatment/ormalvi-dichlorphenamide-tablets. This controlled distribution—in contrast to the traditional wholesaler model used for the Torrent ANDA Product (described *supra*)—ensures that every Ormalvi® prescription passes through a specialty pharmacy that provides the clinical education, DDI counseling, and patient support described herein.

80. Defendants also receive and process adverse event reports from patients, healthcare providers, and/or pharmacists through dedicated adverse reaction hotlines. The Ormalvi®

Approved Labeling and the Cycle Vita™ platform instruct patients to report suspected adverse reactions to Cycle Pharmaceuticals Ltd. at +1-857-437-3969. *See* Cycle Pharmaceuticals Ltd., Patient Support, https://cyclevita.life/select-a-treatment/ormalvi-dichlorphenamide-tablets. On information and belief, the receipt and processing of such adverse event reports provide Defendants with an additional avenue for counseling patients, healthcare providers, and/or pharmacists regarding drug-drug interactions, including the interaction between dichlorphenamide and famotidine.

81. On information and belief, since May 2024, Defendants have been importing Ormalvi® into the United States, and using, offering for sale, selling, marketing, and distributing Ormalvi® throughout the United States, including in New Jersey, through the exclusive specialty pharmacy arrangement with LeMed and the Cycle Vita™ patient-support infrastructure described above.

**DEFENDANTS' KNOWLEDGE OF THE ASSERTED PATENT**

82. On information and belief, Defendants have been aware of the Asserted Patent, and of the claims allowed and issued therein, since at least June 11, 2026 when Xeris publicly announced that the USPTO had issued a Notice of Allowance with respect to U.S. Patent Application No. 17/151,405, entitled "Compositions and Methods of Use," the allowed claims of which cover the use of KEVEYIS® (dichlorphenamide), and Xeris announced that the allowed application was expected to issue as a U.S. patent and that Xeris would submit the patent to FDA for listing in the Orange Book for KEVEYIS®. *See* Xeris Biopharma, *Xeris Biopharma Announces Notice of Allowance From U.S. Patent and Trademark Office for New Patent Covering KEVEYIS®* (June 11, 2026), https://xerispharma.com/news-releases/news-release-details/xeris-biopharma-announces-notice-allowance-us-patent-and.

83. On information and belief, Defendants are aware of, and monitor, Xeris's patent portfolio and patent activity relating to KEVEYIS® and dichlorphenamide, because Defendants collectively develop, manufacture, supply, market and/or sell dichlorphenamide products relying on KEVEYIS® as the reference listed drug, and because the Asserted Patent is listed in the Orange Book for KEVEYIS®. Defendants are sophisticated pharmaceutical companies that routinely monitor the patent landscape for their marketed products, including by reviewing Orange Book listings, patent office publications, and competitor press releases.

84. Further, Defendants are aware of the '502 Patent because Xeris, through its counsel, sent notice letters to Torrent Pharma and Torrent Limited (**Exhibit 2** hereto), Cycle (**Exhibit 3** hereto), and LeMed III and LeMed AZ (**Exhibit 4** hereto) on October 13, 2026, informing them of the existence of the '502 Patent. Those notice letters further set forth claim 1 of the '502 Patent and alerted Torrent Pharma and Torrent Limited that their "continued marketing and distribution of the Torrent ANDA Product and Ormalvi® with the Accused Products' Approved Labeling induces infringement of claim 1 of the '502 Patent," Ex. 2 at 2; alerted Cycle that its "continued marketing and distribution of Ormalvi® with the Ormalvi® Approved Labeling induces infringement of claim 1 of the '502 Patent," Ex. 3 at 2; and alerted LeMed III and LeMed AZ that their "continued dispensing, distributing, and selling of Ormalvi® with the Ormalvi® Label induces patients and/or healthcare providers to infringe claim 1 of the '502 Patent," Ex. 4 at 2. Xeris sent these notice letters by courier and email to Torrent Pharma's Associate Director of Regulatory Affairs, Saroja Gorantla, and Torrent Limited's Managing Director, Aman Mehta; to Cycle's Group General Counsel, Andrea Reiner; and to LeMed III and LeMed AZ's Chief Executive Officer, Shaleen Patel. Exs. 2-4 at 1. Despite these letters, Defendants have not ceased marketing, distributing, promoting, or selling the Accused Products, have not sought to modify the

Accused Products' Approved Labeling or promotional materials to remove or alter the Section 7.2 language, and have not otherwise taken any steps to avoid infringement of the '502 Patent. Instead, Defendants continue to encourage, recommend, instruct, and/or promote healthcare providers to prescribe, pharmacists to dispense, and patients to take the Accused Products for use in a method of treating primary hyperkalemic periodic paralysis or primary hypokalemic periodic paralysis in a patient being administered famotidine by discontinuing the famotidine and administering dichlorphenamide tablets at an initial dose of 50 mg once or twice daily, in a manner that infringes at least claim 1 of the '502 Patent.

85. In addition, on October 13, 2026, Xeris filed a complaint against Defendants in this District alleging that Defendants induce infringement of claim 1 of the '502 Patent through importation, marketing, distribution, offer for sale, and sale of the Accused Products. *See Xeris Pharms., Inc. v. Torrent Pharma Inc. et al.*, No. 2:26-cv-13355 (D.N.J. Oct. 13, 2026). Defendants have therefore had actual knowledge of the '502 Patent, and of Xeris's infringement allegations, since at least October 13, 2026. Defendants' continued sale and promotion of the Accused Products with that knowledge and in the manner described herein demonstrates Defendants' specific intent to induce infringement of claim 1 of the '502 Patent.

## COUNT I — INFRINGEMENT OF THE ASSERTED PATENT

***Inducement Common to All Defendants***

86. Xeris restates, realleges, and incorporates each of the preceding paragraphs as if fully set forth herein.

87. As set forth herein, Defendants have made, used, offered for sale, sold, marketed, distributed, and/or imported the Accused Products in the United States, and continue to do so.

88. The Accused Products are dichlorphenamide 50 mg tablets indicated and labeled for the treatment of primary hyperkalemic periodic paralysis, primary hypokalemic periodic paralysis, and related variants.

89. The Accused Products' Approved Labeling recommends, instructs, and/or encourages healthcare providers and/or pharmacists to prescribe, dispense, and administer the Accused Products for treatment of primary hyperkalemic periodic paralysis, primary hypokalemic periodic paralysis, and related variants, and to initiate dosing at 50 mg by mouth once or twice daily.

90. The Accused Products' Approved Labeling further recommends, instructs, and/or encourages healthcare providers, pharmacists, and/or patients to avoid concomitant administration of dichlorphenamide and famotidine by stating that use of dichlorphenamide with OAT1-sensitive drugs, including famotidine, is not recommended and by instructing patients to notify healthcare providers of all drugs and over-the-counter medications they take.

91. The provision concerning the dangers of coadministration of famotidine and dichlorphenamide is, and is intended to be, a specific warning to healthcare providers, pharmacists, and/or patients instructing them to stop administering famotidine before administering dichlorphenamide. Defendants intend this warning to be effective and to provide immunity from certain tort claims by virtue of its effectiveness.

92. Healthcare providers and/or pharmacists have directly infringed, are currently directly infringing, and will continue to directly infringe claim 1 of the Asserted Patent by using the Accused Products in accordance with the Accused Products' Approved Labeling, and, in the case of Ormalvi®, in accordance with the PIB and the specialty pharmacy counseling described below, to administer dichlorphenamide tablets to treat primary hyperkalemic periodic paralysis or

primary hypokalemic periodic paralysis in human subjects who are also being administered famotidine, including by discontinuing famotidine and administering dichlorphenamide in tablet form at an initial dose of 50 mg once or twice daily, thereby avoiding concomitant administration of famotidine and dichlorphenamide. In each such instance, the healthcare provider and/or the pharmacist has performed or caused, and performs or causes, the performance of each step of claim 1: the pharmacist and the patient act at the behest of the healthcare provider and in accordance with the healthcare provider's prescription, directions, and instructions; and/or the patient and the healthcare provider act at the behest of the pharmacist and in accordance with the pharmacist's drug utilization review determination, consultation, counseling, and instructions. Where the healthcare provider directs the course of treatment, the steps performed by the pharmacist and the patient in carrying out the healthcare provider's directions are attributable to the healthcare provider, and the healthcare provider is therefore liable as the direct infringer of claim 1. Where the pharmacist directs the course of treatment, the steps performed by the healthcare provider and the patient in carrying out the pharmacist's directions are attributable to the pharmacist, and the pharmacist is therefore liable as the direct infringer of claim 1.

93. Alternatively, patients have directly infringed, are currently directly infringing, and will continue to directly infringe claim 1 of the Asserted Patent by discontinuing famotidine and administering dichlorphenamide in tablet form at an initial dose of 50 mg once or twice daily to treat primary hyperkalemic periodic paralysis or primary hypokalemic periodic paralysis, thereby avoiding concomitant administration of famotidine and dichlorphenamide. Patients perform, have performed, and will perform those steps because they are directed, instructed, counseled, and/or encouraged to do so by the healthcare provider and/or the pharmacist, who are in turn directed, instructed, and encouraged to so counsel and instruct the patient by Defendants through the

Accused Products' Approved Labeling and, in the case of Ormalvi®, through the PIB, the Cycle Vita™ patient-support program, and the LeMed specialty pharmacy counseling described below.

94. Xeris pleads the foregoing theories of direct infringement in the alternative, and the theories are not mutually exclusive. Under each theory—whether the direct infringer is the healthcare provider and/or the pharmacist, or the patient acting at the direction, instruction, and encouragement of the healthcare provider and/or the pharmacist—every step of claim 1 of the Asserted Patent has been and is currently being performed in the United States and will continue to be performed, and Defendants knowingly and with specific intent have induced, induce, and will continue to induce that direct infringement.

95. Defendants have induced, are currently inducing, and will continue to induce infringement of claim 1 of the Asserted Patent under 35 U.S.C. § 271(b). Defendants knowingly and with specific intent direct, instruct, and encourage healthcare providers, pharmacists, and/or patients to use the Accused Products in the manner described above, under each theory of direct infringement set forth above, and the Accused Products' labeling has induced, is currently inducing, and will continue to induce such infringement. Defendants' inducement is accomplished through distinct but complementary channels, as set forth below.

96. Defendants' infringement of the Asserted Patent has been and continues to be deliberate and willful, undertaken with knowledge of the Asserted Patent, and without a reasonable basis to believe that the Accused Products and their use as directed by Defendants' labeling, promotional materials, and specialty pharmacy arrangements do not infringe claim 1 of the Asserted Patent.

***Inducement: Torrent ANDA Product***

97. In addition to the common inducement allegations set forth above, Torrent has induced, is currently inducing, and will continue to induce infringement of claim 1 of the Asserted Patent through the following conduct specific to the Torrent ANDA Product.

Label-Driven Pharmacy Conduct: Drug Utilization Review Systems

98. By including the Section 7.2 language on the Torrent ANDA Product Approved Labeling, Torrent knowingly causes drug-drug interaction information regarding famotidine and other OAT1-sensitive drugs to be loaded into automated pharmacy drug utilization review systems nationwide. On information and belief, these computerized DUR systems are standard at retail and specialty chain pharmacies and have been in universal use since the 1990s. When a pharmacist enters a prescription for the Torrent ANDA Product for a patient whose medication profile includes famotidine, the DUR system automatically generates a drug-drug interaction alert based on the Section 7.2 language.

99. Pharmacists dispensing the Torrent ANDA Product are required by federal and state law to screen for and counsel patients on drug-drug interactions when dispensing the Torrent ANDA Product. Pharmacists must conduct a prospective drug utilization review before each prescription is dispensed, which includes screening for drug-drug interactions, including serious interactions with over-the-counter drugs. *See* 42 U.S.C. § 1396r-8(g)(2)(A). Pharmacists are also required to offer to counsel patients on, among other things, "common severe side or adverse effects or interactions and therapeutic contraindications that may be encountered, including their avoidance, and the action required if they occur." *Id.* § 1396r-8(g)(2)(A)(ii)(I). New Jersey likewise requires that "[u]pon receipt of a new or refill prescription, a pharmacist shall examine the patient's profile record either in a manual or electronic data processing system before dispensing the medication, to determine the possibility of a potentially significant drug interaction,

reaction or misutilization of the prescription." N.J.S.A. § 45:14-1 *et seq.*; N.J.A.C. § 13:39-7.21. "Upon determining a potentially significant drug interaction, reaction or misutilization, the pharmacist shall take the appropriate action to avoid or minimize the problem, which shall, if necessary, include consultation with the patient and/or the prescriber." *Id.* New Jersey further requires that before dispensing a new medication, a pharmacist shall make reasonable efforts to counsel the patient on "[c]ommon adverse or severe side effects or interactions and contraindications that may be encountered, including how to avoid such side effects, interactions and contraindications, and the action required if they occur." N.J.A.C. § 13:39-7.21(a)(4).

100. On information and belief, pharmacists at retail and specialty chain pharmacies who dispense the Torrent ANDA Product currently and routinely detect the drug-drug interaction between dichlorphenamide and famotidine through automated DUR alerts, and upon detecting such interaction, take action including contacting the prescribing healthcare provider, counseling the patient, and/or declining to dispense until the interaction is resolved. This pharmacist conduct—screening for the DDI, alerting the healthcare provider, and encouraging and instructing discontinuation of famotidine prior to initiation of dichlorphenamide—constitutes the current practice of the method recited in claim 1 of the Asserted Patent by the pharmacist and/or the healthcare provider, with the patient and the healthcare provider acting at the behest of the pharmacist and/or the patient and the pharmacist acting at the behest of the healthcare provider. In the alternative, the patient currently practices the method of claim 1 by discontinuing famotidine and administering dichlorphenamide as directed and encouraged by the healthcare provider and/or the pharmacist.

101. On information and belief, Torrent knows and specifically intends that the Section 7.2 language on its label has been, is being, and will continue to be, loaded into pharmacy DUR

systems and has triggered, is triggering, and will continue to trigger, legally mandated pharmacist action regarding the famotidine interaction. State pharmacy DUR regulations are public law, DUR systems have been standard automated pharmacy practice since the 1990s, and Torrent (a pharmaceutical manufacturer that distributes into all 50 states) necessarily knows that its label's DDI content has generated, generates, and will continue to generate, alerts requiring pharmacist action upon dispensing. The Torrent ANDA Product's Approved Labeling is not passive text; it functions as a regulatory signal that Torrent knowingly deploys into a system it knows has converted, is converting, and will continue to convert, that signal into compelled downstream conduct by pharmacists, healthcare providers, and/or patients constituting the claimed method.

Pharmacovigilance and Adverse Event Reporting as an Additional Inducement Channel

102. The Torrent ANDA Product Approved Labeling instructs patients and healthcare providers to "report SUSPECTED ADVERSE REACTIONS" by contacting "Torrent Pharma, Inc. at 1-800-912-9561." *See* Torrent ANDA Product Approved Labeling at § 17. On information and belief, Torrent actively receives, processes, and reports adverse drug experiences from patients using the Torrent ANDA Product to the FDA through the FDA Adverse Event Reporting System ("FAERS"). The FAERS database reflects that Torrent is the reporting entity for numerous adverse event reports involving dichlorphenamide from 2023 through the present, including reports coding "Product Substitution Issue," "Drug Ineffective," and "Treatment Failure" as reported reactions. This ongoing patient and healthcare provider engagement confirms that Torrent is not merely a passive distributor of the Torrent ANDA Product but maintains active, ongoing contact with patients and healthcare providers regarding the use of its product, including regarding drug-drug interactions and adverse reactions associated with dichlorphenamide therapy.

103. Under federal law, Torrent is required to "promptly review all adverse drug experience information obtained or otherwise received by the applicant from any source, foreign or domestic, including information derived from commercial marketing experience." 21 C.F.R. § 314.80(b). FDA guidance further provides that "information concerning potential adverse experiences derived during planned contacts and active solicitation of information from patients (e.g., company-sponsored patient support programs, disease management programs) should be handled as safety" reports. *See* FDA, Guidance for Industry — Postmarketing Adverse Experience Reporting for Human Drug and Licensed Biological Products: Clarification of What to Report (Aug. 1997). On information and belief, Torrent's pharmacovigilance obligations create a feedback loop through which Torrent monitors whether the Section 7.2 Drug Interaction warning is being followed by healthcare providers, pharmacists, and/or patients, reinforcing Torrent's knowledge that its label language causes healthcare providers, pharmacists, and/or patients to practice the DDI-avoidance method claimed in the Asserted Patent.

<u>Voluntariness: Torrent's Conduct Goes Beyond Regulatory Compulsion</u>

104. On information and belief, Torrent made no attempt to "skinny label" under 21 U.S.C. § 355(j)(2)(A)(viii) to omit the Section 7.2 Drug Interaction language from the Torrent ANDA Product Approved Labeling. Torrent's volitional retention of the Section 7.2 language—with knowledge that it would be loaded into pharmacy DUR systems and trigger legally mandated pharmacist action regarding the famotidine interaction—supports an inference that Torrent intended healthcare providers, pharmacists, and/or patients to practice the DDI-avoidance method recited in claim 1 of the Asserted Patent.

105. On information and belief, Torrent independently benefits from healthcare providers, pharmacists, and/or patients following the Section 7.2 Drug Interaction warning. When

a healthcare provider and/or pharmacist discontinues famotidine, or directs the patient to discontinue famotidine, before dichlorphenamide is administered in accordance with the DDI warning, no adverse drug interaction occurs, no adverse event is reported, Torrent faces no product liability exposure, and Torrent's federal preemption defense under *PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011), remains intact. Torrent cannot credibly claim it is agnostic about whether healthcare providers, pharmacists, and/or patients follow the DDI warning when Torrent's own legal and financial interests depend on their compliance with that warning.

<u>Specific Intent</u>

106. Torrent's inducement of infringement through the foregoing conduct has been, is currently, and will continue to be knowing and intentional, with specific intent to cause healthcare providers, pharmacists, and/or patients to practice the method recited in claim 1 of the Asserted Patent, which they have done, are currently doing, and will continue to do.

***Inducement: Ormalvi®/Cycle/LeMed Branded Generic***

107. In addition to the common inducement allegations set forth above, Cycle, Torrent, and LeMed (collectively, the "Ormalvi Defendants") have induced, are currently inducing, and will continue to induce infringement of claim 1 of the Asserted Patent through the following conduct specific to Ormalvi®, which goes beyond the Accused Products' Approved Labeling and constitutes independent "active steps to encourage direct infringement" within the meaning of 35 U.S.C. § 271(b).

<u>Beyond-Label Promotional Conduct: The Patient Initiation Brochure</u>

108. In addition to the Accused Products' Approved Labeling, the Ormalvi Defendants further induce infringement through the PIB, which Cycle voluntarily created, published, and proactively distributed to patients prescribed Ormalvi®. The PIB's prescribing information pages

specifically state: "Tell your doctor if you are taking drugs that are sensitive to OAT1 inhibition such as methotrexate, famotidine or oseltamivir." *See* PIB at 11. This language names the exact OAT1 substrates at issue in claim 1 of the Asserted Patent and appears in a promotional brochure—not merely in the FDA-mandated label.

109. The PIB encourages, recommends, instructs, and/or promotes patients to notify their healthcare providers and/or pharmacists that they are taking famotidine so that famotidine can be discontinued prior to initiating dichlorphenamide therapy, thereby avoiding concomitant administration of famotidine and dichlorphenamide as recited in claim 1 of the Asserted Patent, whether that method is performed by the healthcare provider and/or the pharmacist or by the patient acting at their direction and encouragement.

110. The PIB states that it is intended for patients "new to dichlorphenamide or . . . switching from another dichlorphenamide treatment." *Id.* at 1. This language confirms that Cycle anticipates and encourages medication transitions—including transitions that require instructing patients about drug-drug interaction screening and the discontinuation of concomitant medications such as famotidine—in accordance with the method claimed in the Asserted Patent.

111. The Ormalvi Defendants developed, authored, published, distributed, and/or caused the distribution of the PIB with knowledge of the Asserted Patent and with the specific intent to induce healthcare providers, pharmacists, and/or patients to practice the claimed method of administering dichlorphenamide by first discontinuing famotidine in patients who are also being administered famotidine.

<u>Cycle Vita™ Patient Support Infrastructure</u>

112. The Ormalvi Defendants further induce infringement through Cycle Vita™, a dedicated hub support program operated by Cycle that delivers individualized product support to

patients prescribed Ormalvi®. According to Defendants' own public materials, Cycle Vita™ provides "product support to help manage every aspect of the ORMALVI therapeutic routine, such as clinical education and onboarding onto dichlorphenamide." *See* Cycle Pharmaceuticals Ltd., Patient Support, https://www.ormalvi.com/hcp/patient-support. Cycle Vita™ employs dedicated Access Specialists and Clinical Education Managers who provide patients with "clinical education, clinical support and medication administration support." *Id.* On information and belief, such clinical education and medication administration support includes educating patients, healthcare providers, and/or pharmacists regarding the drug interaction between dichlorphenamide and OAT1-sensitive drugs, including famotidine, and instructing or encouraging the discontinuation of famotidine prior to initiation of dichlorphenamide therapy.

113. Through the Cycle Vita™ platform, the Ormalvi Defendants also instruct patients to "[t]ell your healthcare provider about all other prescription and over-the-counter medicines you take, including supplements, as some medicines can interact with ORMALVI." *See* Cycle Pharmaceuticals Ltd., Patient Support, https://cyclevita.life/select-a-treatment/ormalvi-dichlorphenamide-tablets. This instruction directs patients to disclose their use of famotidine and other OAT1-sensitive medications to their healthcare providers and/or pharmacists, thereby encouraging and instructing the discontinuation of famotidine prior to initiation of dichlorphenamide therapy in accordance with the method claimed in the Asserted Patent.

114. The PIB further instructs patients: "You should expect to receive calls from the Cycle Vita™ team to support you in your ORMALVI treatment. Don't forget to save the number to your phone so you know to answer when they call: +1 (888) 360-8482." *See* PIB at 8. This active outbound patient engagement—initiated by Cycle, not by the patient—provides an ongoing channel through which Cycle Vita™ personnel counsel, instruct, and make recommendations to

patients on the ORMALVI therapeutic routine, including drug-drug interactions, on a recurring basis throughout the duration of therapy.

115. According to the Cycle Vita™ website, Cycle Vita™ also provides "on-going personal guidance and education through the duration of therapy" via monthly calls of "up to 30-minutes" that are "tailored to your type of Primary Periodic Paralysis and any known triggers." *See* Cycle Pharmaceuticals Ltd., Patient Support, https://cyclevita.life/select-a-treatment/ormalvi-dichlorphenamide-tablets. Cycle Vita™ further provides "Prescription Renewal Support," confirming that Cycle maintains ongoing engagement with patients beyond the initial dispense and that each prescription renewal represents an additional touchpoint at which DDI counseling may occur. *Id.*

<u>Controlled Prescription Routing and LeMed Specialty Pharmacy</u>

116. The Ormalvi Defendants further route all Ormalvi® prescriptions through a single exclusive specialty pharmacy, LeMed, coordinated by Cycle Vita™, to ensure that patients receive Ormalvi® together with the clinical education and support services available through Cycle Vita™. *See* Cycle Pharmaceuticals Ltd., Where to Send Rx, https://www.ormalvi.com/hcp/faqs/where-to-send-rx. The Cycle Vita™ website confirms that "Pharmacy Routing" is a core service: "We will route your ORMALVI therapy to the appropriate specialty pharmacy and follow-up to ensure swift shipment of your medication." *See* https://cyclevita.life/select-a-treatment/ormalvi-dichlorphenamide-tablets. This controlled distribution—in contrast to the traditional wholesaler model used for the Torrent ANDA Product—ensures that every Ormalvi® prescription passes through a specialty pharmacy that provides the clinical education, DDI counseling, and patient support described herein.

117. The partnership between Cycle and LeMed specifically supports patients living with PPP, and LeMed maintains a dedicated webpage for Primary Periodic Paralysis as one of its rare disease therapeutic areas. *See* LeMed Specialty Pharmacy, *Primary Periodic Paralysis*, https://www.lemedrx.com/specialties/ord/primary-periodic-paralysis.

118. According to LeMed's own website, LeMed "provides patient education on an ongoing basis: during the intake process, upon start of new therapy and through regular personal monthly reassessment calls," and patients "can reach an on-call Pharmacist 24 hours a day, 7 days a week." *See* LeMed Specialty Pharmacy, Support for Patients, https://www.lemedrx.com/pharmacy-patients. LeMed further represents that its "Clinically trained Pharmacists are available to you 24 hours a day, 7 days a week" and that LeMed "is committed to helping remove all barriers to your treatment." *See* LeMed Specialty Pharmacy, Orphan & Rare Disease, https://www.lemedrx.com/specialties/orphan-and-rare-disease. On information and belief, LeMed's patient education, intake counseling, monthly reassessment calls, and clinical outreach services include counseling patients regarding drug-drug interactions with Ormalvi®, including the interaction between dichlorphenamide and OAT1-sensitive drugs such as famotidine.

119. LeMed's pharmacists are required by federal and state law to screen for and counsel patients on drug-drug interactions when dispensing Ormalvi®. Pharmacists must conduct a prospective drug utilization review before each prescription is dispensed, which includes screening for drug-drug interactions, including serious interactions with over-the-counter drugs. *See* 42 U.S.C. § 1396r-8(g)(2)(A). Pharmacists are also required to offer to counsel patients on, among other things, "common severe side or adverse effects or interactions and therapeutic contraindications that may be encountered, including their avoidance, and the action required if

they occur." *Id.* § 1396r-8(g)(2)(A)(ii)(I). New Jersey likewise requires that "[u]pon receipt of a new or refill prescription, a pharmacist shall examine the patient's profile record either in a manual or electronic data processing system before dispensing the medication, to determine the possibility of a potentially significant drug interaction, reaction or misutilization of the prescription." N.J.S.A. § 45:14-1 *et seq.*; N.J.A.C. § 13:39-7.21. "Upon determining a potentially significant drug interaction, reaction or misutilization, the pharmacist shall take the appropriate action to avoid or minimize the problem, which shall, if necessary, include consultation with the patient and/or the prescriber." *Id.* New Jersey further requires that before dispensing a new medication, a pharmacist shall make reasonable efforts to counsel the patient on "[c]ommon adverse or severe side effects or interactions and contraindications that may be encountered, including how to avoid such side effects, interactions and contraindications, and the action required if they occur." N.J.A.C. § 13:39-7.21(a)(4). LeMed's URAC accreditation likewise requires compliance with drug utilization review and patient education standards. Because famotidine is widely available over the counter and its use may not appear in a patient's prescription records, LeMed's pharmacists must counsel Ormalvi® patients on the need to cease taking famotidine before initiating dichlorphenamide in order to satisfy these screening and counseling obligations.

120. These federal and state legal requirements, together with LeMed's URAC accreditation standards, ensure that LeMed's pharmacists screen for and counsel Ormalvi® patients on the drug-drug interaction between dichlorphenamide and famotidine when dispensing Ormalvi®, and, on information and belief, LeMed's pharmacists are currently doing so. This pharmacist conduct—screening for the DDI, alerting the healthcare provider, and encouraging and instructing discontinuation of famotidine prior to initiation of dichlorphenamide—constitutes the current practice of the method recited in claim 1 of the Asserted Patent by the pharmacist and/or

the healthcare provider, with the patient and the healthcare provider acting at the behest of the pharmacist and/or the patient and the pharmacist acting at the behest of the healthcare provider; in the alternative, the patient currently practices that method as directed and encouraged by the healthcare provider and/or the pharmacist. These specialty-pharmacy arrangements serve as a channel through which the Ormalvi Defendants direct, instruct, and encourage healthcare providers, pharmacists, and/or patients to use Ormalvi® in a manner that infringes claim 1 of the Asserted Patent.

121. By choosing to distribute Ormalvi® exclusively through LeMed (a specialty pharmacy that provides ongoing patient education, monthly reassessment calls, and 24/7 pharmacist access), Cycle knowingly channels every Ormalvi® prescription through a regulated entity that is legally required to perform DDI screening and that affirmatively counsels patients on drug interactions as part of its standard practice. Contrasted with the traditional wholesaler model available to any generic manufacturer, Cycle's volitional distribution choice constitutes an independent "active step" through which the Ormalvi Defendants encourage healthcare providers, pharmacists, and/or patients to practice the method recited in claim 1 of the Asserted Patent.

<u>Adverse Event Reporting as an Additional Inducement Channel</u>

122. The Ormalvi® Approved Labeling and the Cycle Vita™ platform instruct patients to report suspected adverse reactions to Cycle Pharmaceuticals Ltd. at +1-857-437-3969. *See* Cycle Pharmaceuticals Ltd., Patient Support, https://cyclevita.life/select-a-treatment/ormalvi-dichlorphenamide-tablets. On information and belief, the receipt and processing of such adverse event reports provides the Ormalvi Defendants with an additional avenue for counseling patients, healthcare providers, and/or pharmacists regarding drug-drug interactions, including the

interaction between dichlorphenamide and famotidine, and for directing the discontinuation of famotidine in patients being administered dichlorphenamide.

123. Under federal law, the Ormalvi Defendants are required to receive, review, and report adverse drug experiences to the FDA. Specifically, 21 C.F.R. § 314.80 requires each applicant with an approved application to "promptly review all adverse drug experience information obtained or otherwise received by the applicant from any source, foreign or domestic, including information derived from commercial marketing experience." *See* 21 C.F.R. § 314.80(b). FDA guidance further provides that "information concerning potential adverse experiences derived during planned contacts and active solicitation of information from patients (e.g., company-sponsored patient support programs, disease management programs) should be handled as safety" reports. *See* FDA, *Guidance for Industry — Postmarketing Adverse Experience Reporting for Human Drug and Licensed Biological Products: Clarification of What to Report* (Aug. 1997). On information and belief, the Cycle Vita™ patient support program (which involves planned contacts with patients and active solicitation of clinical information) generates adverse experience information that the Ormalvi Defendants are required to review and report, further confirming their active engagement with patients regarding the use of Ormalvi®, including drug-drug interactions.

<u>Voluntariness: The Ormalvi Defendants' Conduct Goes Beyond Regulatory Compulsion</u>

124. No federal or state regulation required the Ormalvi Defendants to create the Patient Initiation Brochure, establish the Cycle Vita™ patient support platform, enter into an exclusive specialty pharmacy arrangement with LeMed, conduct active outbound clinical education calls to patients, or provide monthly 30-minute counseling sessions through the Patient Nutrition Program. These are volitional commercial decisions that go beyond anything compelled by the FDA's duty

of sameness, 21 C.F.R. § 314.150(b)(10), or any other regulatory obligation. The Ormalvi Defendants could have sold generic dichlorphenamide with a conforming label and no promotional materials, patient-support infrastructure, or specialty pharmacy arrangements whatsoever (as Torrent does with the Torrent ANDA Product). The Ormalvi Defendants' decision to build out an entire branded-generic support ecosystem—complete with dedicated clinical staff, active patient outreach, controlled pharmacy routing, and promotional materials reproducing the OAT1/famotidine DDI warning—constitutes "active steps to encourage direct infringement" within the meaning of 35 U.S.C. § 271(b). Separately, Defendants affirmatively benefit from healthcare providers, pharmacists, and/or patients following the warning in Section 7.2 of the Accused Products' Approved Labeling, including because compliance averts adverse events, product liability exposure, and the loss of Defendants' preemption defense.

Specific Intent

125. The Ormalvi Defendants' specific intent to induce infringement is demonstrated by the following factors:

- Cycle entered the dichlorphenamide market with a branded generic strategy after the U.S. Court of Appeals for the Federal Circuit affirmed the patentability of claims materially similar to the Asserted Patent in March 2025, with full awareness of the patent landscape;
- the Ormalvi Defendants adopted a branded-generic commercial strategy, including dedicated clinical staff and purpose-built patient-support infrastructure, which was a volitional commercial choice not compelled by any regulation;
- the Ormalvi Defendants independently benefit from healthcare providers, pharmacists, and/or patients following the DDI warning; and

- the Ormalvi Defendants designed and operate the Cycle Vita™/LeMed specialty pharmacy infrastructure knowing that it would result in DDI counseling and famotidine discontinuation—the precise conduct recited in claim 1 of the Asserted Patent.

126. The Ormalvi Defendants' inducement of infringement through the foregoing conduct has been, is currently, and will continue to be knowing and intentional, with specific intent to cause healthcare providers, pharmacists, and/or patients to practice the method recited in claim 1 of the Asserted Patent, which they have done, are currently doing, and will continue to do.

127. Xeris has already suffered, and will continue to suffer, substantial competitive harm as a direct result of Defendants' entry into the market with generic dichlorphenamide products. In its SEC filings, Xeris disclosed that the Torrent ANDA for generic dichlorphenamide was approved on December 29, 2022, and that in May 2024, Torrent partnered with Cycle Pharmaceuticals to launch Ormalvi™, a branded generic version of KEVEYIS®. *See* Xeris Biopharma Holdings, Inc., Annual Report on Form 10-K for the Fiscal Year Ended December 31, 2025, at 11, 50. Since approval of the Torrent ANDA and Defendants' launch of the Accused Products, Xeris has suffered and continues to suffer irreparable harm, including but not limited to loss of market share, price erosion, loss of goodwill and reputation, loss of revenue needed to fund research and development, loss of business opportunities, and loss of its position as the sole supplier of dichlorphenamide for patients with PPP.

128. The harm to Xeris extends beyond the revenue declines already experienced. Xeris has disclosed that "competition from generic equivalents to our products or product candidates could substantially limit our ability to generate revenues and therefore to obtain a return on the investments we have made in our products or product candidates." *See* Xeris Biopharma Holdings, Inc., Annual Report on Form 10-K for the Fiscal Year Ended December 31, 2025, at 50. Every

patient diverted to the Accused Products represents both an immediate loss of revenue and a diminished ability to fund continued investment in patient identification, specialty pharmacy support services, and the ongoing development programs that Xeris maintains for this vulnerable patient population. The irreparable nature of this harm is compounded by the difficulty of recapturing patients once they have been switched to a competing generic product in the ultra-rare disease setting, where physician relationships and specialty pharmacy infrastructure are critical to maintaining market position.

129. Unless Defendants are enjoined from actively inducing infringement of the Asserted Patent, Xeris will continue to suffer irreparable injury. Xeris has no adequate remedy at law, the balance of hardships favors Xeris, and the public interest would be served by the entry of a permanent injunction.

130. Xeris has suffered and will continue to suffer monetary damages, including but not limited to lost profits and/or a reasonable royalty, as a result of Defendants' infringement of the Asserted Patent.

## COUNT III – DECLARATORY JUDGMENT OF INFRINGEMENT OF THE ASSERTED PATENT

131. Xeris restates, realleges, and incorporates each of the preceding paragraphs as if fully set forth herein.

132. In the alternative, and in addition to the claims set forth in Count I, this claim arises under the patent laws of the United States, 35 U.S.C. § 1, *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

133. Defendants are currently making, using, offering for sale, selling, marketing, distributing, and/or importing the Accused Products in the United States, and will continue to do so.

134. The Accused Products are dichlorphenamide 50 mg tablets indicated and labeled for the treatment of primary hyperkalemic periodic paralysis, primary hypokalemic periodic paralysis, and related variants, and are currently being sold and distributed with the Accused Products' Approved Labeling.

135. The Accused Products' Approved Labeling recommends, instructs, and/or encourages healthcare providers, pharmacists, and/or patients to administer the Accused Products for treatment of primary hyperkalemic periodic paralysis, primary hypokalemic periodic paralysis, and related variants, to initiate dosing at 50 mg by mouth once or twice daily, and to avoid concomitant administration of dichlorphenamide and famotidine by stating that use of dichlorphenamide with OAT1-sensitive drugs, including famotidine, is not recommended and by instructing patients to notify healthcare providers of all drugs and over-the-counter medications they take.

136. Healthcare providers, pharmacists, and/or patients are directly infringing, or will directly infringe, claim 1 of the Asserted Patent by using the Accused Products in accordance with the Accused Products' Approved Labeling, and, in the case of Ormalvi®, in accordance with the PIB, the Cycle Vita™ patient-support program, and the LeMed specialty pharmacy counseling described above, to administer dichlorphenamide tablets to treat primary hyperkalemic periodic paralysis or primary hypokalemic periodic paralysis in human subjects who are also being administered famotidine, including by discontinuing famotidine and administering dichlorphenamide in tablet form at an initial dose of 50 mg once or twice daily, thereby avoiding concomitant administration of famotidine and dichlorphenamide, under each of the theories of direct infringement set forth in Count I.

137. Defendants' current and continued making, using, offering for sale, selling, marketing, distributing, and/or importing of the Accused Products with the Accused Products' Approved Labeling is inducing, or will induce, infringement of claim 1 of the Asserted Patent under 35 U.S.C. § 271(b). Defendants have actual knowledge of the Asserted Patent, including since at least October 13, 2026, and knowingly and with specific intent direct, instruct, and encourage, and will continue to direct, instruct, and encourage, healthcare providers, pharmacists, and/or patients to use the Accused Products in a manner that practices the method of claim 1.

138. There exists an actual, real, immediate, and justiciable case or controversy between Xeris and Defendants within the meaning of Article III of the United States Constitution and 28 U.S.C. § 2201 concerning whether Defendants' making, using, offering for sale, selling, marketing, distributing, and/or importing of the Accused Products infringes, or will infringe, claim 1 of the Asserted Patent.

139. Defendants' continued commercialization of the Accused Products, despite receiving Xeris's October 13, 2026 notice letters and Xeris's infringement allegations, creates a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. Defendants have not ceased marketing, distributing, promoting, or selling the Accused Products, have not modified the Section 7.2 language of the Accused Products' Approved Labeling, and, on information and belief, intend to continue such activities.

140. A judicial declaration is necessary and appropriate at this time to resolve the parties' adverse legal interests and so that Xeris may ascertain its rights with respect to Defendants' ongoing and future commercialization of the Accused Products.

141. Xeris is entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201 that Defendants' making, using, offering for sale, selling, marketing, distributing, and/or importing of the Accused Products with the Accused Products' Approved Labeling infringes, or will infringe, claim 1 of the Asserted Patent under 35 U.S.C. § 271(b), and to such further necessary or proper relief based on that declaration as is authorized by 28 U.S.C. § 2202, including injunctive relief under 35 U.S.C. § 283.

142. Unless Defendants are enjoined from inducing infringement of the Asserted Patent, Xeris will suffer irreparable injury. Xeris has no adequate remedy at law, the balance of hardships favors Xeris, and the public interest would be served by the entry of a permanent injunction.

## JURY TRIAL DEMAND

143. Xeris hereby demands a trial by jury on all issues triable as such.

## REQUEST FOR RELIEF

WHEREFORE, Xeris respectfully requests the following relief:

(a) A judgment that Defendants have induced, are currently inducing, and will continue to induce infringement of the Asserted Patent;

(b) A permanent injunction pursuant to, *inter alia*, 35 U.S.C. § 283 enjoining Defendants, their officers, agents, servants, employees, attorneys, affiliates, subsidiaries, successors, assigns, and all persons acting in concert with them, from making, using, selling, offering to sell, marketing, distributing, or importing the Accused Products, or inducing any of the foregoing;

(c) A judgment pursuant to 28 U.S.C. §§ 2201 and 2202 declaring that Defendants' making, using, offering to sell, selling, marketing, distributing, or importing the Accused Products actively induces, or will actively induce, infringement of the Asserted Patent;

(d) An award of damages or other monetary relief adequate to compensate Xeris for Defendants' past, continuing, and future infringement, including lost profits and/or a reasonable royalty, together with pre-judgment and post-judgment interest, costs, and disbursements as justified pursuant to 35 U.S.C. § 284;

(e) A judgment that Defendants' infringement has been willful and an award of enhanced damages under 35 U.S.C. § 284;

(f) A declaration that this is an exceptional case and an award of attorneys' fees pursuant to 35 U.S.C. § 285;

(g) An award of Plaintiff's costs and expenses in this action; and

(h) Such further and other relief as this Court may deem just and proper.

Date: October 20, 2026

FBT GIBBONS LLP

/s/ Charles H. Chevalier
Charles H. Chevalier
Michael V. Caracappa
Christian Villatoro
One Gateway Center
Newark, New Jersey 07102
Phone: (973) 596-4701
Fax: (973) 639-6294
cchevalier@fbtgibbons.com
mcaracappa@fbtgibbons.com
cvillatoro@fbtgibbons.com

*Attorneys for Plaintiff Xeris Pharmaceuticals, Inc.*

OF COUNSEL:

David P. Frazier
Kelly A. Welsh
Rozzi Upton
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200

Marc N. Zubick
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
(312) 876-7606

Sophia Lam
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, New York 10020
(212) 906-1200

*Attorneys for Plaintiff Xeris*

*Pharmaceuticals, Inc.*